No. 20-1743

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

AMAZON.COM, INC.; AMAZON DATA SERVICES, INC.,

*Plaintiffs-Appellees,*

v.

WDC HOLDINGS LLC, d/b/a Northstar Commercial Partners;
BRIAN WATSON,

*Defendants-Appellants*,

and

STERLING NCP FF, LLC; MANASSAS NCP FF;
NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS
CAPITAL LLC; VILLANOVA TRUST; JOHN DOES 1-20,

*Defendants*.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 1:20-cv-484-LO-TCB

_____

**Response Brief of Appellees Amazon.com, Inc. & Amazon Data Services, Inc.**

_____

ELIZABETH P. PAPEZ
  *COUNSEL OF RECORD*
PATRICK F. STOKES
CLAUDIA M. BARRETT
DAVID W. CASAZZA
CHRISTINE A. BUDASOFF
GIBSON, DUNN & CRUTCHER LLP
1050 CONNECTICUT AVE. N.W.
WASHINGTON, D.C. 20036
(202) 955-8500

*Counsel for Plaintiffs-Appellees Amazon.com, Inc. & Amazon Data Services, Inc.*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26 and Local Rule 26.1, Plaintiff-Appellee Amazon.com, Inc. states that it is a publicly traded corporation that does not have any parent corporation. Amazon.com, Inc. is not aware of any entity that owns 10% or more of its publicly traded stock. Plaintiff-Appellee Amazon Data Services, Inc. is a wholly-owned direct subsidiary of Amazon.com, Inc. Neither Appellee is a trade association and no other publicly traded corporation or publicly held entity has any direct financial interest in the outcome of this litigation.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ......................................................6

ISSUE ON APPEAL .........................................................................6

COUNTER-STATEMENT OF THE CASE ...........................................7

    I.   THE ENTERPRISE FRAUD AND KICKBACK SCHEMES .............8

        A.  Relevant Transactions ..............................................8

        B.  Initial Investigations and FBI Warrants ..............................10

        C.  Rescission of Northstar's Contracts and Reformation with IPI..........15

        D.  April FBI Raid .......................................................17

    II.  PROCEEDINGS BELOW .............................................19

        A.  Complaint and TRO ..................................................19

        B.  Preliminary Injunction Proceedings ...................................20

STANDARD OF REVIEW .................................................................24

SUMMARY OF ARGUMENT ............................................................25

ARGUMENT ..................................................................................30

    I.  THE DISTRICT COURT PROPERLY FOUND AMAZON LIKELY TO SUCCEED ON ITS RICO AND OTHER CLAIMS ...................................................................30

        A.  The District Court Properly Found the Injunction "Foursquare" With *Grupo* and This Court's Cases Applying It ......................31

        B.  Amazon Has "Viable" Equitable Interests In the Enjoined Funds .............................................................34

            1.  Common Law Claims For Equitable Relief ...............................34

            2.  RICO Claims........................................................38

        C.  The District Court Properly Calculated the Injunction Amount........43

        D.  Northstar's Jurisdictional Argument Is Meritless ...............................47

**II. THE DISTRICT COURT PROPERLY FOUND THE INJUNCTION NECESSARY TO PREVENT IRREPARABLE HARM TO AMAZON AND THE COURT'S ABILITY TO GRANT RELIEF**.................................................................49

**III. THE DISTRICT COURT PROPERLY ASSESSED THE EQUITIES AND THE PUBLIC INTEREST IN ENTERING THE INJUNCTION** ....................................................................51

**CONCLUSION**........................................................................................55

**REQUEST FOR ORAL ARGUMENT**.............................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.G. Dillard, Inc. v. Stonehaus Constr., LLC*,
  No. 141182, 2016 WL 3213630 (Va. 2016).......................................................35

*Aggarwal v. Sikka*,
  No. 1:12-cv-60, 2012 WL 12870349 (E.D. Va. June 12, 2012) .......................42

*Al-Abood ex rel. Al-Abood v. El-Shamari*,
  217 F.3d 225 (4th Cir. 2000) .............................................................................40

*In re Am. Honda Motor Co. Dealerships Litig.*,
  941 F. Supp. 528 (D. Md. 1996).........................................................................44

*Ancora Capital & Mgmt. Grp., LLC v. Gray*,
  55 F. App'x 111 (4th Cir. 2003) .........................................................................54

*Arnold v. Moran*,
  687 F. Supp. 232 (E.D. Va. 1988) ................................................................42, 48

*Bank of Hampton Rds. v. Powell*,
  785 S.E.2d 788 (Va. 2016) .................................................................................38

*Bell v. Hood*,
  327 U.S. 678 (1946).............................................................................................47

*Bethesda Softworks, LLC v. Interplay Entertainment Corp.*
  452 F. App'x 351 (4th Cir. 2011) (unpublished)................................................50

*Boyle v. United States*,
  556 U.S. 938 (2009).............................................................................................41

*Bright v. QSP, Inc.*,
  20 F.3d 1300 (4th Cir. 1994) ..............................................................................36

*Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*,
  636 F.3d 101 (4th Cir. 2011) ..............................................................................48

*Chevron Corp. v. Donziger*,
  833 F.3d 74 (2d Cir. 2016) .................................................................................39

v

*Crestar Bank v. Williams*,
  462 S.E.2d 333 (Va. 1995) ...................................................38

*De Beers Consol. Mines, Ltd. v. United States*,
  325 U.S. 212 (1945)............................................................32

*Deckert v. Indep. Shares Corp.*,
  311 U.S. 282 (1940)........................................................32, 33

*Edwards v. City of Goldsboro*,
  178 F.2d 1231 (4th Cir. 1999) ...........................................34

*Fed. Ins. Co. v. Smith*,
  144 F. Supp. 2d 507 (E.D. Va. 2001) ...............................36, 37

*Fed. Reserve Bank of Richmond v. Peters*,
  123 S.E. 379 (Va. 1924) ......................................................38

*Flip Mortage Corp. v. McElhone*,
  841 F.2d 531 (4th Cir. 1988) ..............................................42

*Frank Shop, Inc. v. Crown Cent. Petroleum Corp.*,
  564 S.E.2d 134 (2002) ........................................................35

*FTC v. Affordable Media*,
  179 F.3d 1228 (9th Cir. 1999) ............................................52

*FTC v. Bronson Partners, LLC*,
  654 F.3d 359 (2d Cir. 2011) ...............................................37

*FTC v. Vylah Tec LLC*,
  328 F. Supp. 3d 1326 (M.D. Fla. 2018)...............................37

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999)......................................................3, 32, 34

*Hazardous Waste Treatment Council v. S. Carolina*,
  945 F.2d 781 (4th Cir. 1991) .........................................54, 55

*Hughes Network Sys. v. Interdigital Commc'ns*,
  17 F.3d 691 (4th Cir. 1994) ...........................................49, 50

*Instant Air Freight, Co. v. C.F. AirFreight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ...............................................................49

*IUE AFL-CIO Pension Fund v. Herrmann*,
   9 F.3d 1049 (2d Cir. 1993) ................................................................48

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
   841 S.E.2d 642 (Va. 2020) ................................................................36

*Kaiser-Flores v. Lowe's Home Ctrs., Inc.*,
   No. 5:08-cv-45, 2009 WL 762198 (W.D.N.C. Mar. 19, 2009) .........................47

*Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*,
   517 F.3d 476 (7th Cir. 2008) .............................................................36

*Klein v. PepsiCo, Inc.*,
   845 F.2d 76 (4th Cir. 1988) ..............................................................24

*Liu v. SEC*,
   140 S. Ct. 1936 (2020).................................................................37, 39

*Malvino v. Delluniversita*,
   840 F.3d 223 (5th Cir. 2016) ............................................................36

*Menasco, Inc. v. Wasserman*,
   886 F.2d 681 (4th Cir. 1989) ............................................................40

*Microsoft Corp. Antitrust Litig.*,
   333 F.3d 517 (4th Cir. 2003) ............................................................54

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
   915 F.3d 197 (4th Cir. 2019) ............................................................24

*Munson Hardisty, LLC v. Legacy Pointe Apartments LLC*,
   359 F. Supp. 3d 546 (E.D. Tenn. 2019).................................................41

*Nat'l Org. for Women, Inc. v. Scheidler*,
   267 F.3d 687 (7th Cir. 2001) ............................................................39

*Nat'l Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249 (1994)........................................................................45

*Nowak v. Ironworkers Local 6 Pension Fund*,
  81 F.3d 1182 (2d Cir. 1996) .............................................................48

*Oakdale Vill. Grp. v. Fong*,
  43 Cal. App. 4th 539 (1996) ...........................................................36

*Ohio Valley Env't'l Coal. v. U.S. Army Corps of Eng'rs*,
  No. 3:08-c-v-979, 2009 WL 10688886
  (S.D.W. Va. Aug. 21, 2009) .............................................................47

*Online Res. Corp. v. Lawlor*,
  736 S.E.2d 886 (Va. 2013) ...............................................................36

*Palmetto State Med. Ctr., Inc. v. Operation Lifeline*,
  117 F.3d 142 (4th Cir. 1997) ...........................................................41

*Peter Farrell Supercars, Inc. v. Monsen*,
  82 F. App'x 293 (4th Cir. 2003) ......................................................49

*Potomac Elec. Power v. Elec. Motor Supply*,
  262 F.3d 260 (4th Cir. 2001) ...........................................................44

*Quick Serve Concepts, LLC v. Cedar Fair, L.P.*,
  83 Va. Cir. 59 (Va. Cir. Ct. 2011) ....................................................35

*U.S. ex rel. Rahman v. Oncology Assocs.*,
  198 F.3d 489 (4th Cir. 1999) ...............................4, 27, 31, 33, 34, 55

*Real Truth About Obama, Inc. v. FEC*,
  575 F.3d 342 (4th Cir. 2009) ...........................................................30

*Religious Technology Center v. Wollersheim*,
  796 F.2d 1076 (9th Cir. 1986) .........................................................39

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988) .........................................................50

*Robinson v. Empire Equity Grp., Inc.*,
  No. 09-cv-1603, 2009 WL 4018560 (D. Md. Nov. 18, 2009)...........46

*Roe v. Dep't of Def.*,
  947 F.3d 207 (4th Cir. 2020) ......................................................2, 24

*Rolex Watch U.S.A., Inc. v. Crowley*,
  74 F.3d 716 (6th Cir. 1996) ................................................................52

*SAS Inst., Inc. v. World Program Ltd.*,
  874 F.3d 370 (4th Cir. 2017) ...............................3, 27, 31, 33, 49, 50

*SEC v. Bilzerian*,
  29 F.3d 689 (D.C. Cir. 1994) ........................................................4, 45

*SEC v. First City Fin.*,
  890 F.2d 1215 (D.C. Cir. 1989) .........................................................45

*SEC v. McGinn*,
  No. 10-cv-457, 2010 WL 11469814 (N.D.N.Y. Dec. 15, 2010).......................52

*SEC v. Quinn*,
  997 F.2d 287 (7th Cir. 1993) .............................................................53

*Shanaghan v. Cahill*,
  58 F.3d 106 (4th Cir. 1995) ...............................................................49

*Skilling v. United States*,
  561 U.S. 358 (2010)...........................................................................43

*St. Joe Co. v. Norfolk Redevelopment & Hous. Auth.*,
  722 S.E.2d 622 (Va. 2012) .................................................................38

*In re Taneja*,
  743 F.3d 423 (4th Cir. 2014) .............................................................24

*Tudor Associates v. AJ & AJ Servicing, Inc.*,
  36 F.3d 1094 (4th Cir. 1994) .............................................................42

*U.S. Philips Corp. v. KBC Bank N.V.*,
  590 F.3d 1091 (9th Cir. 2010) ...........................................................25

*Union Oil Co. of Cal. v. Leavell*,
  220 F.3d 562 (7th Cir. 2000) .............................................................30

*United Mine Workers of Am. v. Gibbs*,
  383 U.S. 715 (1966)...........................................................................48

ix

*United States v. Butler*,
   211 F.3d 826 (4th Cir. 2000) ...............................................................52

*United States v. First Nat'l City Bank*,
   379 U.S. 378 (1965)............................................................................32

*United States v. Mathis*,
   932 F.3d 242 (4th Cir. 2019) ...............................................................40

*United States v. Pinson*,
   860 F.3d 152 (4th Cir. 2017) ...............................................................42

*United States v. Ruiz-Apolonio*,
   657 F.3d 907 (9th Cir. 2011) ...............................................................52

*United States v. Rylander*,
   460 U.S. 752 (1983)............................................................................52

*United States v. Sasso*,
   215 F.3d 283 (2d Cir. 2000) ................................................................39

*Walton v. Johnson*,
   440 F.3d 160 (4th Cir. 2006) (*en banc*) .............................................24

*In re White*,
   412 B.R. 860 (W.D. Va. 2009) ............................................................35

*Whitney, Bradley & Brown, Inc. v. Kammerman*,
   436 F. App'x 257 (4th Cir. 2011) ........................................................42

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)......................................................................3, 4, 30

*Zahodniick v. IBM Corp.*,
   135 F.3d 911 (4th Cir. 1997) ...............................................................54

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*,
   286 F. Supp. 3d 634 (S.D.N.Y. 2017) .................................................49

**Statutes**

15 U.S.C. § 13 ........................................................................................6

15 U.S.C. § 15 ........................................................................................6

18 U.S.C. § 1957 ..................................................................................41

18 U.S.C. § 1962 ....................................................................................6

18 U.S.C. § 1964(a) .........................................................................38, 39

28 U.S.C. § 1292(a) ................................................................................6

28 U.S.C. § 1331 ....................................................................................6

28 U.S.C. § 1332 ....................................................................................6

28 U.S.C. § 1367(a) ................................................................................6

28 U.S.C. § 1367(c) ..............................................................................48

**Rules**

Fed. R. Civ. P. 4(k) ................................................................................6

Fed. R. Civ. P. 6(c) ..............................................................................46

Fed. R. Civ. P. 65(a) ..............................................................................6

**Other Authorities**

Dobbs, *Law of Remedies* § 2.6(3) (2d ed. 1993) .......................................33

Restatement (First) of Restitution § 1 (1937) .............................................28, 37, 44

Restatement (Third) of Restitution and Unjust Enrichment, §2 (2001) .................36

**INTRODUCTION**

The District Court issued a preliminary injunction restraining Appellants Northstar Commercial Partners and its CEO Brian Watson ("Northstar") from, among other things, dissipating $21.25 million in unjust gains from two elaborate kickback schemes. Northstar and others orchestrated these schemes to obtain illegal profits from over $500 million in development projects with Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. ("Amazon"). Northstar appeals only the provision restraining $21.25 million of its unjust gains. The District Court acted squarely within its discretion in entering this provision, and this Court should affirm.

The kickback schemes at issue are far-reaching and serious. They involve many other defendants and are the subject of ongoing internal and federal criminal investigations. Northstar's role centered around a covert agreement it struck with (now former) Amazon real estate managers Carleton Nelson and Casey Kirschner, arranged by Christian Kirschner, Casey's brother and Watson's friend. Nelson and Casey Kirschner facilitated Northstar's selection for several major Amazon projects that generated tens of millions of dollars in fees, a portion of which Northstar kicked back to Nelson and Casey. The kickbacks were disguised as payments to a trust ("Villanova") that Christian Kirschner set up to launder funds to Casey, Nelson, and other conspirators. Northstar admits transferring at least $5 million to Villanova. And a spreadsheet recovered from Casey's laptop expressly identifies $16.25 million

in Northstar fees as a source of kickback "shares" on three Amazon deals.  Northstar also admits receiving $5 million on a $116 million "flip sale" to Amazon arranged by two former Northstar employees who are now cooperating with federal prosecutors.

Amazon has filed unrebutted sworn testimony that it "would not, under any circumstances, have approved the real estate transactions it entered into with Northstar" had it "been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova." JA1252.  Amazon rescinded all of Northstar's contracts in early April, which is also when the FBI executed a search warrant at Watson's home.  Watson responded by jeopardizing evidence and assets central to this suit.

The District Court issued the preliminary injunction after weeks of proceedings on a 900-page record that detailed this conduct and the need to preserve "[t]he Court's ability to grant effective final relief" by enjoining, among other things, the threatened "destruction, sale, [and/or] transfer of" the $21.25 million at issue in this appeal.  JA618.  Northstar claims that the "law, facts, and public interest all support an order overturning" the provision securing these funds.  Br.12.  But the law and record defeat those arguments, and establish that there was no "abuse of discretion" by the District Court.  *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).  The

challenged provision falls squarely within this Court's precedents approving equita-ble restraints on asset dissipation "before a final judgment can be rendered." *SAS Inst., Inc. v. World Program Ltd*., 874 F.3d 370, 386–87 (4th Cir. 2017). And the relief it provides is "narrowly tailored" to evidence the District Court found far "be-yond that which is necessary" for a preliminary injunction. JA560–61. Although Northstar lays claim to over $60 million on the Amazon deals, JA1776, the order conservatively covers only the $5 million in "flip sale" proceeds Northstar admits it received last year, and the $16.25 million in Northstar lease revenue the record spe-cifically ties to Casey's kickback "shares" on Amazon projects, JA619.

Northstar attacks these findings as based on affidavits submitted at the "elev-enth hour" with "no notice" or "meaningful opportunity to be heard." Br.1, 8. Not so. The affidavits were submitted on the schedule the District Court ordered on Northstar's motion. JA560. Further, Northstar has had ample "opportunity to rebut" the affidavits since they were submitted on May 18. Br.1 But Northstar has not done so despite Amazon's requests and a discovery order. As detailed below, this record establishes the first prong of the preliminary injunction test in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)—likelihood of success.

The record also negates Northstar's claim that the preliminary injunction "vi-olate[s] the Supreme Court's bar on prejudgment attachments in cases at law.'" Br.10 (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc*., 527

3

U.S. 308, 333 (1999)).[1]  It is precisely because *Grupo* addresses only "cases at law," *id.*, that this Court has held *Grupo* "was not presented with, nor did it address, a situation in which equitable remedies were claimed."  *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999).  That is the end of the *Grupo* inquiry here, because equitable remedies *are* claimed in this suit.  Like the plaintiffs in *Rahman*, Amazon asserts claims in "equity" for "unjust enrichment" and remedies including "constructive trust," which "remains an equitable remedy even though it might ultimately reach a fund of money."  *Id.* at 498 (internal quotation omitted).

Northstar insists these claims are "contrived" because they "seek nothing more than money damages" for conduct that caused Amazon "no compensable loss."  Br.1, 26.  This argument misstates the relief the injunction secures.  Amazon was manifestly harmed by Northstar's unlawful acts.  But the measure of the *equitable* relief addressed in the order is not Amazon's "compensable loss," Br.1; it is a "reasonabl[e]"—indeed, modest—"approximat[ion]" of Northstar's *unjust gain*.  *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994).  Such relief is "foursquare" with this Court's precedents applying *Grupo* and *Winter*, JA561, and reversible only on a showing of "clear error" Northstar cannot make.

Northstar's challenge to the District Court's analysis of "irreparable harm" fares no better.  Northstar says the injunction "ignore[s]" the crippling effect of the

---

[1]  All emphasis herein is supplied unless otherwise indicated.

4

$21.25 million "*escrow*" it requires.  Br.21–22.  The record refutes this argument. At Northstar's request, the District Court modified the injunction to allow escrow funding *or* "a surety bond" *or* some "combination" thereof.  JA616.  Yet to this day Northstar has not posted a penny despite a bond offer, its claimed "$1.3 billion in [company] assets," and Watson's $61 million in personal "net worth" including a golf mansion, private ranch, and corporate jet.  JA1309–12.  The District Court did *not* "fail[] to consider" the injunction's impact on Northstar.  Br.20.  It simply and correctly reviewed the foregoing facts and placed greater weight on the unlawful dissipation of evidence and assets that would irreparably harm "th[e] Court's ability to grant effective final relief" in this suit.  JA285–90.  That decision is even more compelling now than when the injunction issued, because Northstar has since liqui- dated assets in violation of the order, refused to account for the proceeds, and been named in several new actions beyond the ongoing criminal investigation.

This record confirms that the only thing the District Court "bent over back- wards to accommodate," Br.1, was Northstar's non-compliance with its orders.  Be- cause Northstar cannot establish any "abuse of discretion" in entering the injunction, it resorts to casting aspersions on the District Court's commitment to "impartial jus- tice."  Br.50.  This Court should reject this unfounded and highly improper attack on the District Court's integrity and affirm the order on appeal.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332 when it entered the injunction on June 5, 2020. It had federal question jurisdiction under Section 1331 because Amazon asserted claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962. JA41–56. And it had diversity jurisdiction under Section 1332 because Amazon is domiciled in Delaware and Washington State, and the original named defendants were domiciled in Colorado, Ohio, and Tennessee, JA19–21.

After the injunction issued, Amazon filed a First Amended Complaint adding a Robinson-Patman Act claim, 15 U.S.C. §§ 13, 15, and new defendants, one of whom is domiciled in Washington State. JA10. Accordingly, when this appeal was filed, the District Court had jurisdiction under Section 1331 but not 1332. The District Court has personal jurisdiction over Northstar pursuant to Fed. R. Civ. P. 4(k), and the power to order preliminary injunctive relief under Fed. R. Civ. P. 65(a). The District Court has supplemental jurisdiction over Amazon's state-law claims pursuant to 28 U.S.C. § 1367(a).

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear this interlocutory appeal from the order granting the injunction. JA0616, JA1632.

## ISSUE ON APPEAL

Did the District Court abuse its discretion in entering the challenged equitable relief against Northstar?

## COUNTER-STATEMENT OF THE CASE

Northstar mischaracterizes the order on appeal and omits facts and procedural history relevant to the only provision of the injunction on appeal. Northstar describes that provision as an "escrow" provision that purportedly operates as "a pre-judgment attachment of fungible assets that can be used to satisfy a potential judgment against [Northstar] for money damages." Br.4. In fact, the text of the provision, as modified by Northstar's bond request, JA1401, orders Northstar to:

> [S]ecure funds totaling $21,250,000.00 USD, representing the sum of certain Amazon real estate development fees to these Defendants in the amounts of
>
>> $4,150,000, $8,500,000, and $3,600,000 for the Shaw Rd., Quail Ridge, and Manassas Lease Transactions, respectively, that were expressly designated for prohibited payments to a former Amazon employee and his affiliates, and
>>
>> the $5,000,000 these Defendants received from Defendants White Peaks Capital LLC and/or NOVA WPC LLC in October 2019 from proceeds on the … sale of a Virginia real estate parcel to Amazon for approximately $116.4 million USD, by
>>
>>> (a) promptly placing in an escrow account maintained according to the terms attached to this order funds totaling $21,250,000.00 USD, or
>>>
>>> (b) obtaining and depositing in the Court's Registry a surety bond from a licensed bonding company for $21,250,000.00 USD, or
>>>
>>> (c) a combination of both (a) and (b) ….

JA619–20.

7

The District Court entered this provision based on extensive evidence and proceedings summarized below.

## I. THE ENTERPRISE FRAUD AND KICKBACK SCHEMES

Northstar concedes that this case involves "two kickback schemes," Br.5: the "'Lease Transaction Enterprise' formed in mid-to-late-2017 through Watson's connection to Amazon's former transaction managers," *id*., and the "'Direct Purchase Enterprise'" involving at least the 2019 "flip" sale orchestrated by "two, now-former Northstar employees," *id*. at 7. Northstar mischaracterizes these schemes as narrow contract disputes for money damages. *Id.* at 6–7. This misleading framing ignores the scope of the challenged enterprises, the extent of the fraud (which Amazon has not yet been able to fully explore and expose through discovery), and Northstar's unjust gains.

### A. Relevant Transactions

Although the full scope of Northstar's unlawful enterprise remains unknown, there is overwhelming evidence that it involved rigged deals on at least ten Virginia properties Amazon acquired through: (i) the build-to-suit lease transactions[2] at issue in the Lease Transaction Enterprise; and (ii) the "flip" acquisition executed by the Direct Purchase Enterprise.

---

[2] The particulars of build-to-suit and direct-purchase transactions are detailed in the record. JA1668.

Amazon's review and approval of both types of transactions relied heavily on former Amazon real estate transaction managers Casey Kirschner and Carleton Nelson. JA82–83. These managers were entrusted with conducting diligence on proposals, validating deal pricing and terms, and shepherding transaction proposals through the "multi-layered internal approval process" Northstar cites. Br.6; JA1668. They had fiduciary duties to discharge these responsibilities honestly. For example, they were bound by a corporate Code of Conduct that required them to: (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly notify the Legal Department" of any potential "conflict of interest," such as "when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com." JA1867–68. And they were bound by employment contracts, "[a]ny breach of" which could "cause Amazon/the Company irreparable harm" that would entitle it to "an injunction, restraining order, or other equitable relief." JA1662–63. These obligations augmented Northstar's obligations on the Amazon deals, which Northstar does not accurately describe, Br. 41–46. Having assessed all of these relationships on the record, the District Court properly found that this case involves a "scheme whose scope and persistence" establishes a likelihood of success on Amazon's RICO and other claims. JA1642.

## B.    Initial Investigations and FBI Warrants

Northstar succeeded in concealing its fraud until December 2019, when a former affiliate blew the whistle and advised Amazon of the kickback scheme, which the informant said could involve more than "$50 million." JA1675–76. This report prompted FBI warrants and an internal investigation that continues today. JA1782, JA1659. These investigations exposed Northstar's involvement in the Lease Transaction and Direct Purchase Enterprises with former Amazon managers Nelson and Casey Kirschner, various LLCs under their control, the Villanova Trust that Christian Kirschner established to launder the kickbacks and other illicit proceeds, and the separate LLCs responsible for the "flip sale" on which former Northstar personnel are now cooperating with prosecutors. JA1669–70.

*The Lease Transaction Enterprise.*    Nelson (who was terminated in June 2019 for serious misconduct unrelated to this suit), recruited Casey Kirschner to Amazon and was his supervisor. JA1669. Watson's longstanding personal relationship with Casey's brother Christian was Northstar's only connection to Amazon. JA1683. Only after they all met in July 2017 did Casey send Watson the sham Request for Proposal ("RFP") that Watson returned in September 2017. JA1681. Northstar's response: (i) stressed Northstar's "commitment, loyalty, integrity, and honesty" in doing development work, JA743; (ii) promised the disclosure of all "Professional Service Providers" in accordance with a template lease warranting that

Northstar "dealt with no brokers, finders or the like in connection with" covered transactions, JA685–86; and (iii) proposed specific LLCs for development of Amazon sites in Virginia, JA638; *see also* JA1684–85.

While Nelson and Casey secured internal approval for Northstar's contracts, Christian set up Villanova and executed the "referral agreement" with Watson to funnel illicit proceeds from the Amazon deals to the trust.  Over the next 18 months, Nelson and Casey secured Northstar's selection as the primary developer for nine deals around Dulles, Virginia executed through four Northstar-affiliated "landlord" LLCs.  JA1689–91.  Watson personally signed the leases for these transactions beginning in February 2018, at least a month *after* he executed the "referral" (kickback) contract with Villanova.  JA1685–87.  All of the leases warranted there were no undisclosed payments of various project fees.  *See, e.g.*, JA1684, JA1686, JA1767, JA1902, JA1906, JA2077.  But in direct contravention of these representations, Northstar and its co-conspirators concealed the Villanova agreement paying Christian Kirschner precisely such fees from Northstar affiliates running the Amazon projects.  JA1685–86, JA1762, JA1805.

There is no record of Villanova performing any services for these payments, which are referenced in public government filings, JA1698–1700, and in Northstar records obtained from cooperating former personnel, JA1687.  Northstar's own fi-

nancial statements indicate that it had received at least $10 million on just two Amazon projects in 2018. JA1700. Amazon's investigation and recent government filings reveal extensive evidence that Northstar used revenue from these and other Amazon projects to pay kickbacks or bribes, JA1687–1700, including over $5 million in wire transfers to Villanova in 2018, JA1839. This evidence includes deleted files recovered from Casey's Amazon laptop documenting "Villanova Trust" payments on Northstar-Amazon projects, JA1763, and another spreadsheet expressly tying $16.25 million in Northstar fees to Casey's kickback "shares" on several Amazon-Northstar deals. JA1837, JA1251.

Northstar mischaracterizes the latter spreadsheet—and its relationship to the injunction on appeal—in a critical respect. Northstar says the District Court ordered "Northstar to place the full amount of" the "total[] $16.25 million" in listed fees "into escrow" even though "the full amount of those fees was not to be paid as a referral or brokerage fee to Villanova Trust." Br.17. This statement improperly conflates the unjust gains the injunction secures with kickbacks "to Villanova Trust." *Id*. The Villanova payments are not the proper—much less only—measure of Northstar's gains on the Amazon transactions in suit. Northstar lays claim to some $60 million from these transactions, and its own financial statements indicate that it

"received at least $10,026,899 in acquisition, leasing, development, and asset management fees on just the Dulles and Quail Ridge lease projects as of late 2018." JA1700.

Those receipts are the tip of the iceberg. Former Northstar personnel cooperating with Amazon have not provided records of Northstar's post-2018 receipts on these or other Amazon deals, and Northstar refuses to provide them in violation of the District Court's July 22 discovery order. Even so, the current record amply supports the $21.25 million ($5 million in "flip sale" proceeds and $16.25 million in lease receipts earmarked to fund kickbacks) the injunction secures.

*The Direct Purchase Enterprise*. In parallel with the Lease Transaction Enterprise, Northstar and its co-conspirators corrupted direct land sales to Amazon, including the White Peaks "flip sale" that Northstar admits its former employees orchestrated for "nearly $18 million" in unjust "same-day profit[s]." Br.7. Those individuals (Kyle Ramstetter and Will Camenson) used two shell LLCs (the White Peaks Defendants), JA1700, to purchase the land for $98.7 million and, in a simultaneous closing, sell it to Amazon for $116.4 million—a price that Casey supported internally at Amazon, without disclosing the inflation, in exchange for a seven-figure kickback. JA2560, JA2587, JA2626. When Watson learned about the transaction, JA2560, he staged and secretly recorded a confrontation with Ramstetter and Camenson in which he accused them of "usurping" Northstar's role on the deal and

13

demanded that they "pay [Northstar] the money immediately." JA1816. That staged meeting backfired.

Ramstetter responded in the recorded conversation by referencing Northstar's misconduct on *other* Amazon transactions, stating "what we did for Amazon—that's FBI …. You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand." JA1819. Ramstetter then encouraged Watson to "work something out" because "if I say something to the wrong person, and it gets out, the whole Amazon thing is shut down and we will never do another deal in the data center space." *Id.* Following these conversations, Northstar did *not* immediately "fire[]" Ramstetter and Camenson as Watson asserted early in this litigation. JA1702. Instead, he "suspended" them pending execution of confidential agreements to share with Northstar $5 million of their unjust proceeds from the Amazon "flip sale." JA1882, JA2395, JA1702, JA492.

After the shakedown, Watson denounced his former employees as "thieves," JA484, and postured the $5 million he secretly extracted from them as a lawful re-covery of money they owed Northstar for "usurping" its "corporate opportunity," JA1636–37. To support this claim, the "Freimann Declaration" Watson cites on appeal, Br.8, attached a "transcript" of his audio recording with the White Peaks defendants, JA345–76. Critically, however, the actual audio file—which Amazon obtained from Northstar's former COO Timothy Lorman and filed below—reveals

that Northstar doctored the transcript to omit references to former Amazon manager (and flip-sale kickback recipient) Casey Kirschner.  JA395, JA425–511.

Lorman submitted an affidavit attesting to the audio recording and also to a call that Watson had with Casey on September 30, 2019 in which Casey "commented" to Watson that "Kyle Ramstetter" (the architect of the "flip sale") "had 'been involved in this for two weeks and he figured out what you and I were doing,' or words to similar effect."  JA492.  The District Court relied on this and other evidence to order Northstar to secure its $5 million share of the unjustly inflated price Amazon paid on the "flip sale," the remainder of which the White Peaks defendants have forfeited to prosecutors.  JA1636–37, JA1640–41, JA1645, JA1650.

### C.    Rescission of Northstar's Contracts and Reformation with IPI

Northstar did not have the capital to develop the Amazon properties covered by Northstar's unjustly obtained contracts.  So Northstar leveraged the substantial budgets Watson personally signed with Amazon to induce a joint venture with equity fund IPI.  JA504.  During the first few years of the venture, Northstar relied on its Amazon co-conspirators to conceal its misconduct.  For example, in April 2018 Northstar told IPI "to include certain fees in the [Northern Virginia] Projects" that IPI thought "were excessive."  JA505.  But Northstar represented to IPI "that an Amazon employee had nonetheless instructed Northstar to include them"—a representation on which IPI reasonably relied.  *Id*.  The game changed in January 2020,

when Lorman approached his IPI contact Luke Gilpin with evidence of Northstar's scheme. JA506–09. At that time, Nelson had already been fired from Amazon and Casey Kirschner was under investigation, so neither had the ability internally to deflect attention or otherwise cover for Northstar.

Lorman discovered evidence of the kickback scheme and other apparent irregularities in Northstar's involvement with Amazon properties and, after investigating, shared his findings (including the audio recordings) with IPI, which in turn shared them with Amazon. JA1693, JA1808, JA2389. Amazon's resulting review did not reveal that IPI "endorsed or engaged in any of the conduct at issue in this suit." JA1682. It did, however, reveal extensive and costly Northstar misconduct at the Amazon lease sites. This misconduct, which is detailed in Gilpin's unrebutted testimony below, included evidence of Northstar's failure to "comply with project requirements," JA505, including draw packages, operating reports, budgets, and compliance work, JA505–06. This misconduct resulted in at least:

i.    "Five credit agreement defaults or draw stops" that "halted" necessary "funding" from project "lenders";

ii.   "Late payments" to "multiple vendors";

iii.  "Multiple breakdowns in financial reporting to Amazon"; and

iv.   "Unauthorized" construction spend of "more than $50 million."

*Id*.[3]  Based on this and other evidence of Northstar's wrongdoing, Amazon and IPI agreed to "(i) terminate or cause to be terminated all agreements" Northstar had with the joint venture and its "landlord" LLCs on the Amazon sites; and (ii) cause IPI "to assume responsibility for completing" the site work.  JA1697.

Contrary to Northstar's statement, Br.6, Amazon and IPI have rescinded *all* contracts with Northstar, and reformed the site agreements so the "landlord" LLCs are controlled by IPI.  JA1682, JA1695–97, JA1885.  For that reason alone, Northstar's assertion that Amazon should have "sued the landlords," Br.12 n.4, makes no sense.  Amazon has sued the parties—including Northstar—responsible for the "misrepresentations" and other misconduct, Br.12, that caused Amazon harm, JA2391–92,[4] including the costly site transitions this year,  JA1697–98.

**D.     April FBI Raid**

On the same day Northstar's contracts were rescinded, the FBI served a search warrant at Watson's home, seized his files and computers, and questioned

---

[3]  Northstar asserts that these "cost overruns" and "vendor issues" are "matters between IPI and Northstar and do not affect Amazon."  Br.23 n.10.  That is incorrect. The costs impact the budgets Amazon approved as the basis for its rent payments as well as its arrangements with project partners, and caused Amazon to incur major costs in the transition itself.  JA1697–98.  To the extent IPI or others helped absorb these costs, they are additional victims of the conspiracy, just like the Northstar investors whose equity payout the government seized in May 2020.  JA2396.

[4]  Amazon continues to investigate how Northstar may have disguised illicit payments in transacting with more than 50 parties involved in the Virginia projects.

him. JA1775. Following the raid, Watson sent a carefully crafted email to a large group that included his co-conspirators and the FBI agents who executed the warrant. *Id*. The email detailed the focus of the government's inquiry; misstated facts in an apparent attempt to mislead the government, alert his codefendants, and coordinate a narrative (as well as prompt dissipation of assets and evidence beyond the files Casey had already deleted); and threatened to interfere with ongoing business at Amazon's Virginia lease sites. JA1775–78.

Notably, the email mischaracterized the Villanova agreement as a "$4,000 per month" contract with one of Watson's "best friends," Christian Kirschner, for "research" and "introduc[tions]" to companies. JA1704. It also stated that, although Christian "introduced" Northstar to his brother Casey Kirschner at Amazon, Northstar's bid for the Amazon Virginia projects was "competitive," the funds Northstar sent Villanova "were never sent to Casey Kirschner or Carl Nelson," and that Amazon was "so pleased" with Northstar's work that Amazon "referred to [Northstar] as their best developer in the country." *Id*. All of these statements are false as shown by the preliminary injunction record, which includes the Villanova agreement guaranteeing major hidden fees on Amazon deals, evidence from Amazon's investigation and public government filings tracing the funds to kickbacks to Casey and Nelson, and the rescission of all of Northstar's contracts.

## II.    PROCEEDINGS BELOW

### A.    Complaint and TRO

Amazon filed its Complaint and sealed TRO application to "prevent spoliation of evidence and dissipation of assets … compromised by Defendants' conduct following [the] FBI raid, and to halt Defendants' interference with Amazon business relationships in this District."  JA1, JA79.  Amazon's 900-plus page filing detailed "evidence" (which has grown) that "Defendants paid millions of dollars in kickbacks to obtain tens of millions of dollars in fees and profits related to at least ten properties Amazon has acquired in the Dulles corridor since 2018." *Id*.  This evidence included audio recordings and documents from Northstar whistleblowers, proof of Northstar's $5 million share of the "flip sale," wire transfer records, recovered computer files, verification of kickback agreements and payments, JA110–24, and accounts of conduct by Northstar and its accomplices that placed "evidence and assets at risk of destruction and conversion," JA79.

The day after Amazon's filing, the District Court held a hearing on Amazon's TRO application and found "good cause to believe that Defendants have engaged in, and are likely to continue to engage in, acts or practices that violate the RICO Act and [other laws]."  JA285–90.  It found that, "unless Defendants are restrained and enjoined by Order of this Court, immediate and irreparable harm will result from ongoing violations of law and inequitable conduct by Defendants and others acting in concert with them."  JA285–86.  Specifically, it found that:

> [I]mmediate and irreparable damage to this Court's ability to grant ef-
> fective final relief will result from the destruction, sale, transfer or other
> disposition or concealment by Defendants or those acting in concert
> with them of otherwise discoverable evidence and assets ….

JA286–87.

## B.    Preliminary Injunction Proceedings

The preliminary injunction was *not* the result of "eleventh hour evidence that Defendants had no opportunity to rebut." Br.1, 8. At Northstar's request, the Court *tripled* the time initially allotted for briefing on the preliminary injunction, JA4, ordering Northstar's opposition for May 14, JA313–77, and Amazon's reply for May 18, JA378–511. Northstar's opposition was supported only by an affidavit from its counsel that attached several documents including the doctored audio transcript described above. JA349. It also attached letters condemning—ironically—former Northstar employees' conversion of corporate opportunities as "Federal FBI type stuff," JA353, "an inherent conflict of interest" and "stealing," JA356, and a "breach of loyalty" warranting "a constructive trust on the proceeds," JA371. Amazon's reply responded directly to Northstar's critique of Amazon's "lawyer affidavits" by providing three confirmatory affidavits from Matthew Doden at Amazon, Luke Gilpin at IPI, and Northstar's own former COO Lorman. These affidavits—which re-

main unrebutted to this day—contain testimony the District Court found "direct, focused, and extremely powerful," but ultimately *unnecessary* to the injunction because they went "*beyond* that" required for a preliminary injunction. JA560.

*May 21 Hearing.* As the lengthy transcript makes clear, JA512–74, the District Court considered all of Northstar's objections to the preliminary injunction. JA5–6. Notably the District Court denied Northstar's oral motion—raised without notice at the hearing—to "strike" Amazon's May 18 affidavits because the Court found that those affidavits rebutted Northstar's May 14 filing. JA560. It then rightly held that Amazon had "properly alleged the RICO claim" (which statutorily authorizes relief in equity), and that Amazon's independent "equitable claims are also properly pled." JA560. The District Court next found the anti-dissipation provision on appeal "foursquare" with this Court's precedents, JA561, "narrowly tailored to the circumstances of this case," and "reasonable in light of the facts." JA561–62.

The Court then indulged Northstar's liquidity concerns with escrow funding, JA565, by holding the injunction in "abeyance" for "ten days" so the parties could "continue to negotiate the terms" and Northstar could "explore options" for a bond. JA569–71, JA575–79. The Court also noted that "discovery [on] an expedited basis may be appropriate" if the parties are "unable to resolve the monetary escrow in any fashion." JA568–69.

***Post-Hearing Proceedings and Injunction***.  Amazon immediately prepared a protective order, accepted Northstar's modified terms for the injunction, and at Northstar's request moved to suspend the order for another week in reliance on their purported bond progress.  JA6.  But after several wasted weeks of accommodation, Northstar offered no security at all, so the Court entered the injunction with the bond option Northstar requested.  JA616.  The only provision Northstar appeals, Br.8 n.4, is the one requiring it to secure "$21,250,000 USD" in (conservatively) documented unjust gains on Amazon deals, JA561-62, JA582, JA619.

***Show Cause Proceedings and July Discovery Order.***  Northstar has consist-ently defied this and other provisions of the injunction, including by recently liqui-dating a multi-million dollar property.  JA1304.  Based on this pattern of misconduct, Amazon sought an order to show cause why Northstar should not be held in con-tempt.  JA1284.  The motion focused on Northstar's failure to provide any judgment security despite:  (i) its bond offer; (ii) claimed "$1.3 billion in assets under [corpo-rate] ownership and management," JA1309; (iii) the recent property liquidation net-ting some $700,000 in dissipated proceeds, JA1304, JA1427; and (iv) Watson's claimed $61 million in personal "net" worth including "unencumbered" equity in a 35-acre ranch, a jet, and a golf estate, JA1307–12, JA1430 (Schedule 3).

Northstar opposed Amazon's motion by arguing—as it does on appeal—that the "escrow" requirement is wrong and crippling.  Br.1.  But Northstar ignored the

bond option and to this day defies the District Court's order to answer discovery requests, Dkts. 94–95, regarding its "financial benefits" from the Amazon transactions, Dkt. 94-1 at 10; proof of its purported inability to obtain any "judgment security," *id.* at 9; and documentation "sufficient to show all assets and financial interests," *id.* at 8–9. Such information might support Northstar's dubious claim that the injunction secures "$21.25 million" based on a "mistake[]" that imposes a "death sentence before trial," Br.22. But Northstar has refused to provide this information despite a discovery order and Amazon's offers to modify the injunction if Northstar substantiates its objections.

***Denial of Stay Pending Appeal.*** The District Court denied Northstar's stay motion because, while it asserted "material defects" in the injunction, it "fail[ed] to show any actual abuse of discretion." Dkt. 137 at 3. The District Court found that, despite Northstar's repeated assertions that compliance would cause it irreparable injury, the record "raises a substantial question as to the actual injury [Northstar] will suffer," and that Northstar has "failed to answer" this question despite innumerable opportunities. *Id.* In contrast, the District Court found the evidence of irreparable harm to Amazon clear, *id.* at 5, and more compelling now than ever given

23

recent evidence of Northstar's illicit asset liquidation, discovery stonewalling, and proliferating legal actions,[5] JA1425.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). Under this "deferential standard," this Court will not reverse "so long as 'the district court's account of the evidence is plausible in light of the record viewed in its entirety.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 213 (4th Cir. 2019) (quoting *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006) (*en banc*)). Only a "clear error in factual findings or a mistake of law is grounds for reversal" under this standard. *Id.* This Court "will not reverse a [district court's] factual finding that is supported by the evidence unless that finding is clearly wrong." *In re Taneja*, 743 F.3d 423, 429 (4th Cir. 2014). And the Court "will conclude that a finding is clearly erroneous only if, after reviewing the record, we are left with 'a firm and definite conviction that a mistake has been committed.'" *Id.* (quoting *Klein v. PepsiCo, Inc.*, 845 F.2d 76, 79 (4th Cir. 1988)).

---

[5] *See Healy v. R. Brian Watson et al.*, No. 2020-cv-32273 (Colo. Dist. Ct. July 6, 2020), *Richards v. WDC Holdings LLC et al.*, No. D162019CV34472 (Colo. D. Ct. 2019); *Ann Arbor Senior Living LLC v. Watson*, No. 2020CV31099 (Colo. Cty. Ct. 2020); *Balfour v. Watson*, No. 2020CV31099 (Colo. D. Ct. 2020).

## SUMMARY OF ARGUMENT

The "very purpose of a preliminary injunction … is to preserve the *status quo* and the rights of the parties until a final judgment issues." *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010). That is precisely what the injunction here does, and the District Court in no way abused its discretion by entering it.

To begin, the record forecloses Northstar's claim that it had "no meaningful opportunity to be heard." Br.8, 11. The record also forecloses Northstar's baseless attack on the District Court's commitment to "impartial justice," Br.12, and specifically its assertion that the injunction reflects a decision to "treat [Plaintiff] Amazon more favorably than Defendants due to its significant market power." *Id*. The only unfair position in these proceedings is Northstar's argument that Amazon's success somehow excuses Northstar's fraud and unjust gains. Northstar's brief accuses a federal court of aiding a corporate "behemoth" to try "to put Northstar out of business." Br.5, 22. But this is not the David and Goliath story Northstar makes out. It is a straightforward account of sophisticated schemes by wealthy professionals who colluded to commit widespread commercial fraud, and who got caught red-handed when their bank records, deleted files, and former associates exposed their unlawful acts.

Stripped of Northstar's inflammatory rhetoric and attacks on the District Court's integrity, all that remains is the argument that the District Court erred in

applying the *Winter* factors for preliminary injunctive relief. Tellingly, Northstar inverts these factors to relegate the first one—likelihood of success—to the end of its brief. Br.24. But Northstar's challenge to the District Court's analysis fails no matter the order, because it does not establish anything approaching the "clear error" or "mistake of law" required to reverse the District Court's findings.

**Likelihood of Success Under Winter *and* Grupo**. Northstar has no viable challenge to the District Court's well-substantiated findings on likelihood of success, so it recasts this *Winter* factor as a "jurisdictional" test, arguing that the "District Court lacked jurisdiction because the RICO claim should be dismissed." Br.32. That is simply wrong. Even if Amazon's RICO claims were not viable—which the District Court correctly held they are—dismissal of these claims would be a merits determination with no effect on subject-matter jurisdiction.

Northstar's remaining attacks on the "viability" of Amazon's claims, Br.32–50, similarly fail. Northstar begins by recycling the "single victim" and other RICO pleading challenges the District Court correctly rejected. JA1641. It then transitions to a hash of contract arguments that misrepresent the record by asserting that Amazon somehow consented to kickbacks. Br.41–48. Northstar's tactics are transparent. It paints this case as a routine suit for contract damages in order to argue that "Amazon has not paid the [$21.25 million] to be placed in escrow and thus could not have been damaged in that amount." Br.18. This tactic fails for three reasons.

26

*First*, it improperly conflates the "damages" Amazon can recover on claims "*at law*," *id.*, with the District Court's power to secure Northstar's unjust gains for recovery "*in equity*." This Court has expressly approved preliminary equitable relief to prevent asset dissipation "before a final judgment can be rendered." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386–87 (4th Cir. 2017). Northstar ignores this by trying to shoehorn this case into "the Supreme Court's bar on pre-judgment attachments in cases *at law*.'" Br.10 (quoting *Grupo*). But as this Court has held, *Grupo* does not govern "situation[s] in which equitable remedies [a]re claimed." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999). There is no *Grupo* issue here because Amazon raises the same equitable claims this Court endorsed in *Rahman*, which authorize "an equitable remedy 'even though [they] might ultimately reach a fund of money.'" *Id.* at 498.

*Second*, Northstar's attack on the strength of Amazon's claims fails because the record contains evidence far "beyond that which is necessary" even for a prelim-inary injunction. JA560. Northstar admits receiving at least $5 million of Amazon's payment on the "flip sale" involved in the Direct Purchase Enterprise. And it admits funneling millions in concealed "fees" to the "brother of one of the Amazon trans-action managers," Br.6, whose recovered files expressly identify $16.25 million in Northstar fees as a source of his kickback "shares," JA283, JA1241. Amazon of-

fered unrebutted testimony that it "would not, under any circumstances, have approved" the deals "with Northstar" had it "been aware of the[se] undisclosed conflicts of interest," JA1252.  That means every penny of Northstar's gain on the transactions was unjust and recoverable in equity.  The injunction merely protects a conservative estimate of these unjust gains.  *Supra* 3.  And Northstar's failure to substantiate its claim of error in this amount is both fatal to its appeal and inexcusable given the District Court's discovery order.

*Third*, Northstar's response that Amazon's claims, whether pled in law or equity, improperly seek "money" for "no compensable loss," Br.26, confirms the fatal flaw in its appeal.  Amazon has suffered significant compensable loss, JA503, and the fact that IPI or others may have shared in that loss, Br.6, 23 n.10, simply confirms additional RICO victims.  But the injunction would be proper even without these losses, because it secures Northstar's unjust gains, which are properly enjoined even where—unlike here—the "plaintiff has not suffered … any loss" at all.  Restatement (First) of Restitution, § 1, *cmt. e*.

***Irreparable Harm and Balance of Interests.***  Northstar's arguments on the remaining *Winter* factors, Br.15–32, remain as empty and "difficult to follow" as they were below, Dkt. 137 at 5.  The argument that it is unnecessary to "destroy" Northstar's business with an "escrow" because Northstar has the "wherewithal" to pay a judgment now, Br.22, ignores the injunction's plain terms (particularly the

bond option), and the temporal nature of the harm it addresses.  The whole point of the security provision is to ensure that assets Northstar has today remain available after final judgment.  JA1647–48 (citing the controlling decisions in *Hughes*, *Microsoft*, *Grupo*, and *Rahman*, as well as the unpublished *Bethesda Softworks* decision Northstar invokes).  Because Northstar claims enough "net worth" to comply with the injunction now, JA1309–13, JA1409–55, it is left to argue that the District Court "fail[ed] to consider" the harm that compliance would cause.  Br.20.

This argument fails because the District Court *did* "consider" Northstar's alleged harm.  It simply found that Northstar had not "answer[ed]" substantial "questions" about its claimed injury.  So the District Court properly found Northstar's unsubstantiated objections outweighed by the documented and ever-increasing evidence of information misuse and asset dissipation that would irreparably harm "th[e] Court's ability to grant effective final relief" absent the injunction.  JA285–90.

This record does not show an abuse of discretion on any *Winter* factor, much less a due process or jurisdictional problem.  And Northstar cannot change that reality by asserting that its unjust gains are a "mere blip on [the] balance sheet" of an "e-commerce behemoth" in "Seattle," Br.5, 21.  A party's right to seek justice and recover as a RICO victim does not vary based on the victim's financial status.  The Court should thus affirm the challenged order.  Any other result would improperly "deprive[]" Amazon of the "benefit of [its] judgment, and reward[] defiance" of the

District Court's considered exercise of equitable discretion.  *Union Oil Co. of Cal.*

*v. Leavell*, 220 F.3d 562, 566 (7th Cir. 2000).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to

succeed on the merits, that he is likely to suffer an irreparable injury in the absence

of preliminary relief, that the balance of equities tips in his favor, and that an injunc-

tion is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008).  "[A]ll four requirements must be satisfied," *Real Truth About Obama, Inc.*

*v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009) *vacated on other grounds* 559 U.S. 1089

(2010), as the District Court properly found here, JA1638, JA1652.

## I.    THE DISTRICT COURT PROPERLY FOUND AMAZON LIKELY TO SUCCEED ON ITS RICO AND OTHER CLAIMS

The District Court correctly found the injunction supported by "direct, fo-

cused, and extremely powerful" evidence "*beyond* that which is necessary at this

stage" of the case.  JA560.  As the court observed, "this lawsuit is based on essen-

tially the same subject matter that led to the FBI's search warrant … [*i.e.*,] conduct

that supported law enforcement's finding of probable cause," JA1639, and that es-

tablishes a strong likelihood of success on Amazon's civil claims.  *See* JA1642

(RICO);  JA1642-44 (tort and contract); JA1648–50 (equitable claims); JA560 (all

claims "properly pled").  It then rightly held that several of these claims authorize

the equitable relief the order properly secures under circuit law allowing preliminary

injunctions over funds that will "likely not be available, if they're not restrained, prior to the resolution of the case." JA561.

Northstar challenges these findings on two primary grounds. First, it argues that the injunction improperly attaches "money damages" in violation of *Grupo Mexicano*. Br.24–28. Second, it contends that even if Amazon alleges equitable claims consistent with *Grupo*, the claims lack merit. Br.29–50. Both arguments fail in these incarnations, and when recast as due process and jurisdictional challenges. Br.32–34.

## A.    The District Court Properly Found the Injunction "Foursquare" With *Grupo* and This Court's Cases Applying It

Northstar's appeal centers on the claim that the injunction "violate[s]" the *Grupo* "bar on prejudgment attachments in cases at law." Br.10. This argument fails for a host of reasons, first and foremost that a preliminary injunction securing assets—*including money*—is proper where, as here, the plaintiff pleads an *equitable* interest in the assets. That is what this Court held in the two cases—*United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999) and *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386–87 (4th Cir. 2017)—Amazon cited and the District Court expressly invoked below, JA561, but which appear *nowhere* in Northstar's brief. This omission alone disposes of their appeal, as Northstar's remaining arguments confirm in improperly rewriting Amazon's "equitable claims," Br.1, 24, to dodge these precedents and shoehorn this case into *Grupo*.

31

That shoe does not fit.  As Northstar concedes, *Grupo* involved "only money damages" on claims "at law," Br.25, specifically a breach claim for payment on bonds in which the plaintiff asserted "*no* lien or equitable interest." 527 U.S. at 310, 312.  On appeal, the defendant challenged a sweeping injunction blocking it from "affecting" the plaintiff's claimed payment right in the bonds.  *Id.* at 312–13.  The Supreme Court held that because the "relief [plaintiff] requested was traditionally accorded by courts of equity," *id.* at 318–19, it was improper in a legal action *solely* for contract damages, *id*. at 327.

In reaching this conclusion, the Supreme Court stressed the critical point supporting the order here:  "a preliminary injunction is always appropriate to grant immediate relief *of the same character as that which may be granted finally*."  *Grupo*, 527 U.S. at 326 (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *see also Grupo*, 527 U.S. at 324–26 (reaffirming cases preliminarily enjoining asset dissipation).  Applying this principle, the Supreme Court has long endorsed the use of preliminary injunctions "to preserve the *status quo* pending final determination of the questions raised" in cases that "state[] a *cause for equitable relief*."  *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290, 288 (1940) (rescission and restitution); *see also United States v. First Nat'l City Bank*, 379 U.S. 378 (1965) (affirming preliminary injunction of asset transfers that could impair judgment collection).

The upshot of these cases—like this Court's decisions in *Rahman* and *SAS*—is that where a district court *is* acting on equitable claims for equitable remedies, a "temporary injunction [is] eminently appropriate to prevent further dissipation of assets." *Id*. at 385. Like the plaintiffs in *Rahman*, Amazon seeks "equitable remedies"—including constructive trust and disgorgement—of Northstar's unjust gains. The District Court did not "fail[] to apply the Supreme Court's *Grupo Mexicano* decision to" this record. Br.1. It correctly applied *Grupo* and circuit law in "invok[ing] equity to preserve the *status quo* pending judgment" based on overwhelming evidence—far "beyond" the typical preliminary injunction case and *Rahman* itself—that a post-judgment "legal remedy might prove inadequate [to protect] the court's ability to grant the relief requested." *Rahman*, 198 F.3d at 496.

That the injunction secures money is irrelevant. As this Court explained in *Rahman*, injunctive relief on claims for "unjust enrichment" and "constructive trust" "remains an equitable remedy '*even though it might ultimately reach a fund of money.*'" 198 F.3d at 498 (quoting Dobbs, *Law of Remedies* § 2.6(3) (2d ed. 1993)). Amazon asserts precisely such "equitable claims" and remedies here, JA1741–45, and the required "nexus between the cognizable claims in suit and [Northstar's] assets" is satisfied because the pleadings "'contain[] allegations which, if proved, [would] entitle [Amazon to] equitable relief,'" *id.* (quoting *Deckert*, 311 U.S. at 289).

33

**B.    Amazon Has "Viable" Equitable Interests In the Enjoined Funds**

Desperate to avoid the law above, Northstar insists that Amazon's "equitable claims" are not "viable" and really are just disguised legal claims for "money damages." Br.24, 26, 29. As a threshold matter, this argument fails because it treats only two "claims" (unjust enrichment and conversion) as "equitable." Br.26–29. But *Grupo* and its progeny do not focus on "claims"; they focus on "whether the *relief* [plaintiffs] request[] was traditionally accorded by courts of equity." *Grupo*, 527 U.S. at 319; *Rahman*, 198 F.3d at 497–98 (constructive trust and voiding fraudulent transfers are "equitable remed[ies]"). That is important because Amazon seeks several forms of equitable "relief"—including the disgorgement and equitable liens sought in *Rahman*, JA6–67, JA1753–55; 198 F.3d at 496, and the equitable relief expressly authorized by the RICO statute—that Northstar does not address at all. Northstar thus waives any opposition to these remedies. *Edwards v. City of Goldsboro*, 178 F.2d 1231, 241 n.6 (4th Cir. 1999).

### 1.    Common Law Claims For Equitable Relief

Northstar shows no clear error in the District Court's finding that Amazon is likely to succeed on its common law requests for equitable relief.

***Unjust Enrichment***. The District Court correctly found Amazon likely to succeed on its unjust enrichment claim because the record shows: "(1) a benefit conferred on the defendant by the plaintiff," *see* JA1681–96, 1700–03 (documenting lease awards, related profits, and White Peaks profits); "(2) knowledge on the part

of the defendant of the conferring of the benefit," *see id.*; and "(3) acceptance or retention of the benefit … in circumstances that render it inequitable for the defendant to retain the benefit," *see* JA1684, JA1693–94, JA1252 (documenting Northstar's deal-rigging, kickbacks, and other misconduct that resulted in revenues "Amazon would not, under any circumstances, have approved" absent Northstar's deception). *See generally Quick Serve Concepts, LLC v. Cedar Fair, L.P.*, 83 Va. Cir. 59 (Va. Cir. Ct. 2011) (holding that unjust enrichment claims permit equitable recovery of *all* gains flowing from the defendant's inequitable conduct) (citing *Frank Shop, Inc. v. Crown Cent. Petroleum Corp.*, 564 S.E.2d 134, 139 (2002)).

Northstar's response that here, such unjust enrichment claims are barred by Amazon's contract counts, Br.19, is meritless. As a threshold matter, this argument conflicts with Northstar's position that it is not party to any of the breached agreements.[6] Br.12 n.4. Further, the doctrine of election does not preclude pleading breach and unjust enrichment in the alternative. It merely precludes the award of

---

[6] Although the injunction does not rest on the contract claims, they are proper against Northstar. Watson signed the Amazon leases as the *alter ego* of the executing LLCs, JA844, and is thus liable for their contracts. *See A.G. Dillard, Inc. v. Stonehaus Constr., LLC*, No. 141182, 2016 WL 3213630 (Va. 2016) (veil piercing applies to LLCs); *In re White*, 412 B.R. 860, 864–65 (W.D. Va. 2009) (same).

duplicative *recoveries* on different legal claims for the same violations.[7]  *See Mal-vino v. Delluniversita*, 840 F.3d 223, 233 (5th Cir. 2016) (collecting authorities). That is not an issue at this stage, and in any event, Virginia law allows even parallel *recovery* on unjust enrichment and breach claims where, as here, the inequitable conduct ranges beyond the contract breach.  *See Online Res. Corp. v. Lawlor*, 736 S.E.2d 886, 899–900 (Va. 2013) (affirming such a verdict); *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 648 (Va. 2020) (declaring "'plainly erroneous' broad statements such as 'there can be no unjust enrichment in contract cases'" (quoting Restatement (Third) of Restitution and Unjust Enrichment, § 2, *cmt. c* (2001))).

*Conversion.*  The District Court also correctly found Amazon likely to suc-ceed on its conversion claim based on evidence of "distinct act[s] of dominion wrongfully exerted over the property of another, and in denial of rights, or incon-sistent therewith."  *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 517–18 (E.D. Va. 2001).  That is all that is necessary to "support a conversion claim," *id*. at 520, which requires only that "the alleged converter has applied the property to his own use," *id.* (quoting *Oakdale Vill. Grp. v. Fong*, 43 Cal. App. 4th 539, 544 (1996)).  Such

---

[7] Indeed, the cases Northstar cites on double recovery are post-judgment cases. *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (summary judgment and jury verdict); *Keck Garrett & Assocs. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (summary judgment).

36

conversion is amply pled here, because contrary to Northstar's argument, Br.30, "it is well-settled that money … *may* be converted." *Fed. Ins.,* 144 F. Supp. 2d at 518 n.25.

***Disgorgement, Constructive Trust, Equitable Liens.*** Northstar's assertion that Amazon has not "quantif[ied]" or "traced" the injunction amount to funds Amazon paid Northstar, Br.9, 17–31, similarly fails to undermine Amazon's equitable claims.

First, disgorgement is measured by the wrongdoer's "unlawful profits," *Liu v. SEC,* 140 S. Ct. 1936, 1943 (2020), not the plaintiff's "quantif[iable] loss," Br.17. That is why disgorgement is proper even when "the plaintiff has *not suffered a corresponding loss, or in some cases, any loss*" at all. Restatement (First) of Restitution § 1, *cmt. e.* It is also why "monetary equitable relief like disgorgement … does *not* require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return." *FTC v. Vylah Tec LLC*, 328 F. Supp. 3d 1326, 1331 (M.D. Fla. 2018); *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 374 (2d Cir. 2011) ("[I]t is by now so uncontroversial that tracing is not required in disgorgement cases that we recently rejected an argument to the contrary via summary order"). Accordingly, Amazon need not "trace" the enjoined funds to payments Amazon has made. *See, e.g.*, *Fed. Ins.*, 144 F. Supp. 2d at 523 (any party "may be liable for restitution to a defrauded party for money had and received to the

37

extent she is enriched").  What matters is the unrebutted evidence that all of Northstar's gains on the Amazon transactions were unjust, because Amazon would "never" have approved them absent Northstar's fraud.  A1252.

Second, even the "constructive trust" cases Northstar cites, Br.31 n.15, do not require "tracing" where, as here, the record shows that the unjust gains "passed" through the hands of the defendant, and an "amount equal to" those gains was "in [the defendant's] hands" at the time of judgment,[8] *Fed. Reserve Bank of Richmond v. Peters*, 123 S.E. 379, 386 (Va. 1924).

## 2.    RICO Claims

The District Court also correctly found Amazon likely to succeed on its RICO claims, which independently support the injunction.  The RICO statute expressly authorizes district courts "to prevent and restrain violations" by issuing equitable orders "including, but not limited to … divest[ing] any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person … or ordering dissolution or reorganization of any enterprise." 18 U.S.C. § 1964(a).

---

[8]  The two Virginia cases Northstar cites are inapposite because they address the scope of a constructive trust asserted *after judgment* on assets that the plaintiff's trial evidence did *not* connect to entrusted property.  *See Bank of Hampton Rds. v. Powell*, 785 S.E.2d 788, 789 (Va. 2016); *Crestar Bank v. Williams*, 462 S.E.2d 333, 336 (Va. 1995).  The funds here *are* connected to Amazon's claims, and are thus recoverable regardless of their travels through intermediaries.  *See St. Joe Co. v. Norfolk Redevelopment & Hous. Auth.*, 722 S.E.2d 622, 626 (Va. 2012).

The order here falls squarely within these provisions of Section 1964, which the Second and Seventh Circuits have applied in private RICO suits. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016); *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001), *rev'd on other grounds* 537 U.S. 393 (2003).[9]  Rightly so, because this approach accords with the rule that, when Congress "entrusts to an equity court the enforcement of prohibitions contained in a regulatory enforcement, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." *United States v. Sasso*, 215 F.3d 283, 289 (2d Cir. 2000); *see also Liu,* 140 S. Ct. at 1940 n.1 ("'disgorgement of improper profits' … is 'traditionally considered … equitable'") (citation omitted).

Section 1964(a)'s equitable language helps explain the vehemence with which Northstar attacks Amazon's RICO claims.  Br.32–42.  But Northstar cannot make up with passion what its arguments lack in merit, which is why the District Court correctly rejected them.  Northstar's continued assault on the RICO claims as "alleg[ing] a single scheme with a single victim," Br.41, conflicts with this Court's admonition that "[t]here is no *per se* rule against a RICO claim involving only one

---

[9]   *But see Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1088–89 (9th Cir. 1986) (private equitable relief not authorized).  This Court has not ruled on the question, and does not appear to have commented on it since the decisions in *Donziger* and *Scheidler*.

39

victim." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). On appeal Northstar chides Amazon for "tr[ying] to squeeze good news out of this Circuit's general discouragement of single victim RICO cases." Br.41. But Northstar never says why this "good news" does not dispose of its claims, particularly because its own cases say "[p]redicate acts which arise under a single scheme … *may* be a pattern for RICO purposes if they are continuous and related," *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

Here, the record shows two unlawful enterprise schemes involving kickbacks and bribery, wire fraud, money laundering, and market manipulation executed by at least 11 named defendants whose conspiracies targeted at least nine commercial leases and at least one nine-figure land purchase[10] in connection with various yet-to-be-named accomplices and shell entities. *See supra* pp. 6–18. These schemes involved both "close-ended" repetition and "open-ended" plans to continue the illicit conduct after the corrupt managers departed Amazon (both were ultimately fired). Br.34. And, although these schemes would qualify as RICO enterprises even if they

---

[10] Northstar cannot exploit the "flip-sale" or other distinct components of the RICO schemes as grounds for limiting its liability. JA433–35 (arguing that Watson did not learn of the sale until after it closed and he extracted his cut). A RICO "defendant can conspire to violate RICO … without himself committing or agreeing to commit the two or more acts." *United States v. Mathis*, 932 F.3d 242, 260 (4th Cir. 2019) (quotation omitted).

only victimized Amazon, Northstar admits they have also injured IPI and other business partners, as well as Northstar investors.   Br.23 n.10; JA2396.   "[I]t does not matter for purposes of victim identification that these other entities are not party to this suit." *Munson Hardisty, LLC v. Legacy Pointe Apartments LLC*, 359 F. Supp. 3d 546, 565 (E.D. Tenn. 2019) (citing cases).

As the District Court concluded, "the underlying facts here suggest a 'scheme whose scope and persistence set [Northstar's conduct] above the routine,'" JA1642, and that robustly pleads RICO liability for predicates including wire fraud, JA1712–13, JA1724–25, honest services fraud, JA1713–14, JA1725–27, money laundering, JA1714–16, violations of 18 U.S.C. § 1957, JA1716–17, JA1727, and violations of the Travel Act, JA1718–19, JA1728.   *See generally Palmetto State Med. Ctr., Inc. v. Operation Lifeline*, 117 F.3d 142, 148 (4th Cir. 1997) (civil RICO liability requires allegations of "an enterprise, which is defined as an ongoing organization, formal or informal, in which the various associates function as a continuing unit," that was "conducted" through a "pattern of racketeering activity," meaning "two acts of racketing activity within a ten-year period").

Northstar shows no error in the District Court's analysis of these elements, which "are to be 'liberally construed to effectuate [the RICO statute's] remedial purposes.'"  *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, codified at 18 U.S.C. § 1961 Note). And the pages Northstar spends arguing

that "Amazon has not pleaded a viable RICO claim," Br.34–41, ignore the District Court's findings and cite only the inapposite decisions Northstar unsuccessfully asserted below.  JA1641.[11]

Northstar's fallback claim that the "District Court wrongly considered inapplicable contract provisions to support [its assessment] of fraud and breach," Br.42–50, is also meritless.  This argument begins with the same flawed "privity," rescission, and election of remedies points addressed above.  *See* Br.42, 48 n.24 (Northstar is not "party to any of the leases at issue"); *id*. 43–44 (Amazon cannot "receive relief" in tort for breach of "a contractual duty').  It then relies on an inaccurate melee of contract arguments to assert that Amazon's "RICO" claims cannot proceed because "no representations concerning undisclosed fees were made," Br.48, the

---

[11]  *Whitney, Bradley & Brown, Inc. v. Kammerman* involved a single employee's submission of falsified time entries and expense reports. 436 F. App'x 257, 259–60 (4th Cir. 2011).  *Flip Mortgage Corp. v. McElhone* involved fraudulent underpayment on a single contract.  841 F.2d 531, 533 (4th Cir. 1988).  *United States v. Pinson* lacked an enterprise because the various participants "were not involved in each venture, much less in each underlying racketeering act."  860 F.3d 152, 163 (4th Cir. 2017).  *Aggarwal v. Sikka* involved a single corporate take-over where the defendants "allegedly fraudulently sold a *single* business saddled with an allegedly unreasonable, *limited-time* contract."  No. 1:12-cv-60, 2012 WL 12870349 at *4 (E.D. Va. June 12, 2012).  *Arnold v. Moran* merely held that a single bad corporate takeover did not convert the directors of the target company into a RICO enterprise. 687 F. Supp. 232, 233 (E.D. Va. 1988).  And *Tudor Associates v. AJ & AJ Servicing, Inc.,* did not include key "summary judgment [papers] in the joint appendix," which made assessing Tudor's "RICO claim … very difficult" for this Court, which could not find identify any relationship between the appellant and members of the single entity accused of mishandling debt payments.  36 F.3d 1094 at *4 (4th Cir. 1994).

"budgets" that determined Amazon's "rent" on the lease sites were "disclosed," *id.* 43–44, and Amazon cannot allege that "it has been charged for any unbudgeted expenses," *id.* 48. There is a lot wrong with this argument.

First, the contract predicates are wrong—Watson *did* represent that no undisclosed fees would be paid on Amazon's projects, JA837, JA42, JA1019—though this is irrelevant on appeal because neither the injunction nor Amazon's RICO claims depend on these breaches. Second, Northstar's focus on "rent" and whether Amazon "paid" for "unbudgeted expenses" rehashes its misplaced "damages" arguments that have nothing to do with the order securing its "unjust gains" for recovery *in equity*. Third, Amazon's contracts, no matter how deconstructed, did not authorize Northstar's kickbacks or permit honest services fraud, which is an independent RICO predicate. *See Skilling v. United States*, 561 U.S. 358, 408 (2010) ("there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks"); *supra* n.10 (RICO conspirators liable for all enterprise conduct).

In sum, Amazon's RICO and other claims are likely to succeed.

## C.    The District Court Properly Calculated the Injunction Amount

Northstar next challenges the amount of the injunction, insisting that it orders Northstar to "place $21.25 million into escrow on the mistaken belief that such payment had been made" by Amazon. Br.17. This claim is meritless. It starts with the false premise that the injunction requires an "escrow" of Amazon "payment[s]" to

Northstar, Br.17, in order to urge reversal because Amazon never "quantif[ied]" $21.25 million in "damages" or other "compensable loss."  Br.17, 19.  Beyond ignoring the injunction's bond alternative, JA616, this argument again ignores that the $21.25 million secures relief in equity, *not* "damages" (which Amazon has no obligation to "quantify" at this stage anyway).[12]  As noted, this distinction is critical, because a preliminary injunction securing unjust gains is proper even where "the plaintiff has not suffered … any loss" at all.  Restatement (First) of Restitution § 1, *cmt. e* (1937).  This remedial rule is most often applied against "fiduciary" defendants like Carleton Nelson and Casey Kirschner, who are "ordinarily accountable" in equity for gains derived from their fiduciary relationship even where (unlike here) their "beneficiary suffered no loss."  *Id.*  But the rule applies equally to Northstar, particularly as conspirator to honest services fraud.  Accordingly, the injunction amount is proper if it reasonably estimates their unjust gains.[13]  It plainly does.

Northstar admits receiving the $5 million "flip sale" payment covered by the order.  Br.26 n.13.  And the record shows that Northstar received "at least $10,026,899 in acquisition, leasing, development, and asset management fees on just

---

[12] *See In re Am. Honda Motor Co. Dealerships Litig.*, 941 F. Supp. 528, 538 (D. Md. 1996).  Indeed, RICO does not require damages quantification even at summary judgment.  *See, e.g., Potomac Elec. Power v. Elec. Motor Supply*, 262 F.3d 260, 265 (4th Cir. 2001) ("quantifiable damages are [not a] precondition to RICO liability").

[13] That some of these gains may have been initially funded by Amazon partners such as IPI or banks, Br.23 n.10, is irrelevant.  *See supra* 27, 39–40.

the Dulles and Quail Ridge lease projects as of late 2018," JA1700; *see also* JA283, JA1660, JA1677, JA1694, JA1810, and paid at least $5.1 million to Villanova, JA1808, JA1837, JA1839, JA2387.  As noted, these records and receipts are just the tip of the iceberg, because they do not include Northstar's receipts on:  (i) the fore-going two Amazon lease projects after 2018; (ii) other Amazon lease projects over the period in suit; or (iii) receipts from Amazon direct purchase deals.  Northstar continues to defy the District Court's order to answer discovery requests for these amounts, which may far exceed the modest $16.25 million in Northstar fees the in-junction secures based on Casey's recovered files documenting that sum as a direct source of his kickback "shares" on at least three projects.  JA283, JA1251.

This evidence goes well beyond the "general factual allegations of injury re-sulting from the defendant's conduct" that the Supreme Court has held sufficient "at the pleading stage [of a RICO case]." *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994).  And Northstar presents no competing evidence that the Dis-trict Court's calculation of the injunction was "mistaken," Br.17, much less clearly erroneous.  This failure is fatal, because even decisions reviewing permanent injunc-tions entered with the benefit of trial evidence refuse to alter "disgorgement calcu-lation[s] unless [they] constitute[] *clear error*," and require only that awards "*rea-sonably approximate*[]" the defendant's illicit gains.  *SEC v. Bilzerian*, 29 F.3d 689, 697 (D.C. Cir. 1994); *SEC v. First City Fin.*, 890 F.2d 1215, 1228 (D.C. Cir. 1989).

Northstar's purported excuse for this failure—that the District Court prevented it from contesting the injunction in "violation" of "due process," Br.22, 24—borders on sanctionable. Amazon's April 27 filing, JA72, was accompanied by hundreds of pages of evidence, JA110–283, JA/S148–755, including an affidavit that *attached* the spreadsheet documenting kickback "shares" that would be sourced from the $16.25 million in Northstar fees the injunction secures, JA283, JA1251. Northstar had ample opportunity to rebut that number, but it did not. It just criticized Amazon's reliance on a counsel affidavit to introduce the documents supporting it. JA314. So Amazon's reply attached confirmatory declarations from Amazon, IPI, and Northstar's own former COO rebutting Northstar's critique and substantiating the evidence, JA425–511, under the same rule Northstar erroneously resurrects on appeal. Br.22.

That rule says that an "opposing affidavit must be served at least 7 days before the hearing, *unless the court permits service at another time*." Fed. R. Civ. P. 6(c)(2). Northstar's "Rule 6" challenge thus fails both under the rule itself—because the District Court, on Northstar's motion, JA4 Dkt. 31, set the date of Amazon's reply three days before the hearing—and also under the many cases holding that the Rule "does *not* preclude affidavits supporting a reply brief when they respond to evidence supporting an opposition brief." *Robinson v. Empire Equity Grp., Inc.*,

No. 09-cv-1603, 2009 WL 4018560 at *2 (D. Md. Nov. 18, 2009).[14]  Furthermore, since May 18 Northstar has had innumerable opportunities to "rebut" the affidavits, including at the May 21 hearing, during the post-hearing negotiations culminating in the June 5 order, throughout the summer show cause and stay proceedings, and to this day in court-ordered discovery.  Northstar has provided no rebuttal.[15]

## D.    Northstar's Jurisdictional Argument Is Meritless

In a last-ditch effort to undermine the District Court's merits findings, Northstar repackages its failed RICO challenge as a jurisdictional bar.  Br.32–50.  Specifically, it says the "district court's subject matter jurisdiction rests on the viability of Amazon's RICO claims," which are "not viable" or well "pled."  Br.32–33.  Again Northstar is wrong.

"[T]he failure to state a proper cause of action calls for a judgment on the merits and *not* for a dismissal for want of jurisdiction."  *Bell v. Hood*, 327 U.S. 678, 682 (1946).  "[I]n cases where the asserted basis for subject matter jurisdiction is also an element of the plaintiff's allegedly federal cause of action," a court asks only "whether—on its face—the complaint is so drawn as to seek recovery under federal

---

[14] *See also, e.g.*, *Kaiser-Flores v. Lowe's Home Ctrs., Inc.*, No. 5:08-cv-45, 2009 WL 762198 at *8 (W.D.N.C. Mar. 19, 2009).

[15] If Northstar ever produces valid evidence that the enjoined amount is incorrect, they can seek modification in the District Court as they have been repeatedly invited to do.  *See, e.g.*, *Ohio Valley Env't'l Coal. v. U.S. Army Corps of Eng'rs*, No. 3:08-c-v-979, 2009 WL 10688886 at *1 (S.D.W. Va. Aug. 21, 2009).

law." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1189 (2d Cir. 1996). "If so, then we assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Id*. This alone ends the jurisdictional inquiry here, because Amazon's RICO claims, which the District Court found "likely to succeed," JA1642, are plainly not "so insubstantial, implausible, or otherwise completely devoid of merit as to not involve a federal controversy." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993).[16]

Further, Amazon's original complaint was separately grounded in federal diversity jurisdiction.[17] Its current complaint contains a new federal (Robinson-Patman Act) claim, JA1666, JA1749–51, that Northstar mentions only in a footnote that cannot support appellate relief, Br.32 n.16. And even dismissal of all of these federal claims would not terminate supplemental jurisdiction over Amazon's state-law claims. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S.

---

[16] None of the cases Northstar cites for its "jurisdictional" argument is jurisdictional. Nearly all involve *only* merits challenges under 12(b)(6), not jurisdiction under 12(b)(1). *See* Br.34–41 (citing *Northwestern Bell*, *Sedima*, *Pinson*, *Kammerman*, *Migdal*, *Al-Abood*, *Anderson*, *Tudor*, *Mensaco*, *Flip Mortgage*, *Sikka*, and *American Bancard*). And the one case that mentions 12(b)(1)—alongside 12(b)(6)—did not reach jurisdiction. *Arnold*, 687 F. Supp. at 236.

[17] Northstar says there was no diversity in April because two defendant LLCs were organized in Delaware just like Plaintiff Amazon Data. Br.32. It is wrong. "For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of all of its members," *not* by its state of incorporation, so the LLCs were citizens of Colorado, Ohio and Tennessee. *Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

715, 725 (1966). As this Court has observed, "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995); *Peter Farrell Supercars, Inc. v. Monsen*, 82 F. App'x 293, 297 (4th Cir. 2003). Accordingly, jurisdiction would remain even without Amazon's well-pled RICO claims. *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp.3d 634, 652 (S.D.N.Y. 2017).

## II. THE DISTRICT COURT PROPERLY FOUND THE INJUNCTION NECESSARY TO PREVENT IRREPARABLE HARM TO AMAZON AND THE COURT'S ABILITY TO GRANT RELIEF

Northstar similarly identifies no error in the District Court's finding that the injunction is necessary to prevent "irreparable harm," *i.e.*, "harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight, Co. v. C.F. AirFreight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989); JA285–90, JA616–22, JA1650. Indeed, Northstar's own brief confirms that the "assets [it] currently h[olds]" are "likely to become unavailable before damages can be collected." *SAS*, 874 F.3d at 386–87; *see also Hughes Network Sys. v. Interdigital Commc'ns*, 17 F.3d 691, 696 (4th Cir. 1994) (affirming injunction "to ensure that a defendant's assets are not so dissipated that a monetary judgment will be frustrated"). These authorities dispose of the argument that the "danger of insolvency" poses no "irreparable harm"

warranting an injunction here.  *Hughes*, 17 F.3d at 696; *SAS,* 874 F.3d at 386–87 (enjoining "disburse[ment] [of] assets" before judgment).

Northstar's reference to *Bethesda Softworks, LLC v. Interplay Entertainment Corp*.  452 F. App'x 351 (4th Cir. 2011) (unpublished), does not change this.  *Bethesda* addressed an injunction that did "*not* preserve [defendant's] assets [to] satisfy a judgment in the event Bethesda prevails on the merits."  *Id.* at 354.  It is thus irrelevant apart from its passing observation that "insolvency *may* alter the *status quo* and undermine a court's ability to render a meaningful judgment" such that a "preliminary injunction may be appropriate 'to preserve the plaintiff's opportunity to receive an award of money damages at the judgment.'"  *Id.* (internal citations omitted).  That is the case here.  *See, e.g.*, JA1658, JA1662–63, JA1699–1700, JA1703–1705; *see also* JA1284–1317, 1409–1422.

The record demonstrates that absent the injunction, Northstar will dissipate assets in ways that "alter the *status quo* and undermine [the District] Court's ability to render a meaningful judgment."  *Bethesda*, 452 F. App'x at 354 (citing authorities).  That is an "irreparable harm" under settled law.  *See id*.; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988) (upholding preliminary injunction "to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies").  And this law applies to Amazon's equitable claims to secure funds (specifically Northstar's $21.25 million in unjust gains), just as it

does to the anti-spoliation and confidential information provisions Northstar does not challenge.  Br.4 n.1; JA620–21, JA1297.

## III.  THE DISTRICT COURT PROPERLY ASSESSED THE EQUITIES AND THE PUBLIC INTEREST IN ENTERING THE INJUNCTION

Northstar's challenge to the District Court's remaining findings also mischaracterizes the injunction as requiring Northstar "to escrow $21.25 million," Br.1, in order to argue that:  (i) the injunction is a "death sentence before trial" because it would require Northstar to "sell off [its] real estate investments at a loss and to cease operations," Br.21; and (ii) the District Court "failed to consider" this harm in "balancing" Amazon's inability to collect "damages" against "the destruction of [Northstar's] business," Br.10, 21.   These arguments are meritless, just like Northstar's "public interest" challenge to the order.

***Balance of Equities.***  The record forecloses the claim that the District Court "failed to consider" Northstar's "escrow" objections before entering the injunction.  Br.10.  At Northstar's request, the District Court delayed and *modified* the order to include the bond alternative Northstar proposed and does *not* challenge as a "death sentence" or otherwise, *id*. at 21.  The record also establishes that the District Court properly balanced the impact of posting the required judgment security against the

51

"irreparable" harm of judgment frustration detailed above. JA1650–51.[18] The District Court revisited that balance when it denied Northstar's stay request, acknowledging that financial harm was Northstar's "strongest argument," but concluding the record still "raises a substantial question as to the actual injury [Northstar] will suffer," which Northstar has "failed to answer." Dkt 137 at 4. Nothing has changed.

Even assuming "impossibility" is a valid ground for reversing the injunction,[19] Northstar has not and cannot show it. *United States v. Rylander*, 460 U.S. 752, 757 (1983); *United States v. Butler*, 211 F.3d 826, 831 (4th Cir. 2000). Specifically, it cannot "show categorically and in detail why [it is] unable to comply with the court's order," *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996), and that this "inability [is] substantiated and not … self-imposed." *SEC v. McGinn*, No. 10-cv-457, 2010 WL 11469814, at *1 (N.D.N.Y. Dec. 15, 2010). That is because the record establishes that Northstar *can* comply by leveraging its current and substantial assets. Br.22; JA1309–13, JA1409–55.

---

[18] Northstar tries to salvage its balancing challenge by arguing that, "[a]lthough it referenced the financial harm to Defendants, the district court did not address that issue in its analysis." Br.20 (citing JA1650). This argument fails. In conducting its admitted balancing, JA1650–52, the court was "*not* required to provide a detailed explanation as to each of its reasons for rejecting every argument made by counsel." *United States v. Ruiz-Apolonio*, 657 F.3d 907, 920 (9th Cir. 2011).

[19] *But see, e.g.*, *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (treating "impossibility" as a contempt defense).

Northstar responds with the bizarre argument that its current "wherewithal to fund the requested escrow completely undermines the basis for an injunction in the first place." Br.22. As the District Court observed, this logic is "difficult to follow," Dkt. 137 at 5, and is dispensed by the law and record. The injunction is necessary precisely because Northstar can secure its unjust gains from the Amazon transactions now, but is highly unlikely to be able to do so after trial because it will spend those funds. Indeed, Northstar suggested below that it needs the funds to litigate the many claims against it. But Northstar has no right to retain or use its unjust gains—whether to buy mansions, run its business, or defend the many lawsuits against it. While "parties to litigation usually may spend their resources as they please to retain counsel, *[t]heir* resources is a vital qualifier. Just as a bank robber cannot use the loot to wage the best defense money can buy … so a swindler in securities markets cannot use the victims' assets to hire counsel to help him retain the gleanings of crime." *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (emphasis in original).

The District Court properly applied the foregoing law in balancing Northstar's unverified objections to the injunction, JA1293–97, JA1398, JA1633, with its ongoing defiance of the bond provision, *see* JA1396, JA1425, disregard of court orders, JA1294–97, and general campaign of obstruction and asset dissipation. *See, e.g.*, JA509–10, JA1289, JA1304, JA1696–98 (property liquidation, misuse of confidential information, threats to Amazon partners), JA353, JA436, JA395, JA461,

53

JA1640–41 (misrepresenting recorded conversations to the court).  This record, combined with Northstar's involvement in a growing number of government and private suits, confirms that the injunction is critical not only to protect Amazon's confidential information and goodwill pending final judgment, but also to "preserv[e] the *status quo*" on Northstar's unjust gains so the District Court "can render a meaningful decision after a trial."  *Hazardous Waste Treatment Council v. S. Carolina*, 945 F.2d 781, 788 (4th Cir. 1991).[20]  The equities favor the injunction.

***Public Interest.***  Northstar's challenge to the District Court's public interest determination consists of the assertion that the District Court was biased in favor of Amazon's "market power."  Br.50.  But the only support it cites is the District Court's statement that "[t]rusted business partners will be necessary to secure [Amazon's] ongoing development in the public interest," *id.* (quoting JA1652), which is no support at all.  In sharp contrast, the record shows that that the District Court properly entered the injunction to "protect the *status quo*" and "prevent irreparable harm during the pendency of a lawsuit."  *Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003); *see generally* JA1647–48 (citing *Microsoft*), JA378–405 (explaining the need to prevent dissipation or conversion of unjust gains).  This Court has expressly endorsed injunctions that further these goals as "serv[ing] the

---

[20]  *See also Zahodniick v. IBM Corp.*, 135 F.3d 911, 915 (4th Cir. 1997) (affirming injunction protecting confidential information and business relationships); *Ancora Capital & Mgmt. Grp., LLC v. Gray*, 55 F. App'x 111, 112 (4th Cir. 2003) (same).

public interest," *Rahman*, 198 F.3d at 492, precisely because the public has a stake in "preserv[ing] the *status quo* so that a court can render a meaningful decision after a trial on the merits," *Hazardous Waste Treatment*, 945 F.2d at 788 (quotations omitted).

## CONCLUSION

The Court should affirm the injunction.

## REQUEST FOR ORAL ARGUMENT

This appeal involves important questions of law and an extensive factual record. Oral argument would assist the panel's resolution of the appeal.


Dated:  September 17, 2020                    Respectfully Submitted,

                                              *s/ Elizabeth Papez*
                                              ELIZABETH P. PAPEZ
                                                *Counsel of Record*
                                              PATRICK F. STOKES
                                              CLAUDIA M. BARRETT
                                              DAVID W. CASAZZA
                                              CHRISTINE A. BUDASOFF
                                              GIBSON, DUNN & CRUTCHER LLP
                                              1050 Connecticut Ave. N.W.
                                              Washington, D.C. 20036
                                              (202) 955-8500

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 12,983 words. This brief complies with the typeface and style requirements because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

_s/ Elizabeth Papez_

Elizabeth Papez
GIBSON, DUNN, & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

*Counsel to Plaintiffs-Appellees
Amazon.com, Inc. & Amazon Data
Services, Inc.*

56